**In Re Anonymous No. 9 D.B. 84**

Disciplinary Board Docket No. 9 D.B. 84.

KECK, *Member*, February 27, 1985 — Pursuant to Rule 208(d) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits this report on the above-captioned matter.

## I. HISTORY OF THE PROCEEDINGS

1. Respondent is a formerly admitted attorney. He was born in 1944 and was admitted to the practice of law in the Commonwealth of Pennsylvania in 1969.

2. On December 16, 1983, an information was filed against respondent in the United States District Court for the [ ] District of Pennsylvania charging him with ten counts of receiving illegal fees for legal services rendered to claimants for lung benefits from the United States Department of Labor, in violation of Title 33, United States Code, §928(e). On that same date respondent pleaded guilty to the ten counts of receiving illegal fees.

3. On January 6, 1984, respondent was sentenced to a prison term of six months followed by probation for two years and was assessed fines totaling $10,000. The probation includes the conditions, among others, that he make restitution of $84,740.60 and contribute eight hours of community service per month. The prison term was subsequently reduced.

4. On February 3, 1984, the Supreme Court of Pennsylvania entered an order immediately suspending respondent from the practice of law in accord with Rule 214 of the Pennsylvania Rules of Disciplinary Enforcement, and referring the matter to the Disciplinary Board for institution of formal proceedings to determine the final discipline to be imposed.

5. On February 21, 1984, Disciplinary Counsel filed a petition for discipline charging respondent wth violation of the following Disciplinary Rules:

a. D.R. 1-102(A) (3) — dealing with illegal conduct involving moral turpitude;

b. D.R. 1-102(A) (4) — dealing with conduct involving dishonesty, fraud, deceit, or misrepresentation;

c. D.R. 1-102(A) (5) — dealing with conduct that is prejudicial to the administration of justice;

d. D.R. 1-102(A) (6) — dealing with conduct adversely reflecting upon a lawyer's fitness to practice law;

e. D.R. 2-106(A) — dealing with the charging of illegal fees; and

f. D.R. 7-101(A) (3) — dealing with intentionally prejudicing or damaging the client during the course of the professional relationship.

6. Hearings were held March 29, 1984 and June 11, 1984 before hearing committee [ ] composed of [ ].

7. The report of hearing committee [ ] was filed October 30, 1984.

8. Letters in lieu of briefs on exceptions were filed by Disciplinary Counsel, November 19, 1984 and by respondent, December 10, 1984.

9. The matter was adjudicated by the Disciplinary Board January 23, 1985. The board accepted the report of the hearing committee as to findings of

fact and conclusions of law but rejected the recommendation that respondent be suspended for one year effective February 3, 1984, and recommends that respondent be suspended for a period of three years retroactive to February 3, 1984.

## II. FINDINGS OF FACT

The Disciplinary Board concurs with hearing committee [ ] in findings of facts, and incorporates herein by reference:

(a) Paragraphs 1-5 of the petition for discipline;
(b) Petitioner's proposed findings of fact;
(c) Respondent's proposed findings of fact; and
(d) The hearing committee's additional findings of fact.

The complete findings of fact are listed in Appendix A to this report.

## III. CONCLUSION OF LAW

The Disciplinary Board accepts and concurs with the conclusion of law reported by hearing committee [ ], to wit:

"1. All procedural and due process requirements in this case have been met.

"2. Respondent's conduct with respect to his legal representation of black lung claimants which constituted violation of 33 U.S.C. §928(e) also subjects him to disciplinary action due to violation of the following Disciplinary Rules:

"1-102(A)(3) — illegal conduct involving moral turpitude;

"1-102(A)(4) — conduct involving dishonesty, fraud, deceit, or misrepresentation;

"1-102(A)(5) —conduct prejudicial to the administration of justice;

"1-102(A)(6) — conduct which adversely reflect upon his fitness to practice law;

"2-106(A) — relating to the charging of illegal fees;

"7-101(A)(3) — intentionally prejudicing or damaging the client during the course of the professional relationship.

"In addition grounds exist for disciplinary action pursuant to Rule 203(b)(1), Pa.R.D.E."

## IV. DISCUSSION

Although respondent pleaded guilty to ten counts of collecting illegal fees, testimony at the hearing indicated that he collected illegal fees in many more cases. Investigation by the Inspector General's Office of the Department of Labor discovered 42 such instances and publicity associated with his guilty plea generated information about 23 additional instances for a total of $165,629.75 in illegal fees. Although respondent has made complete restitution, his actions constitute a severe violation of the Disciplinary Rules.

Disciplinary Counsel, in his November 7, 1984 letter addressed to Mrs. Nan Cohen, cites the cases of Office of Disciplinary Counsel v. Desmond no. 281, Disciplinary Docket no. 1, Disciplinary Board no. 19 D.B. 81, and Office of Disciplinary Counsel v. McCrea no. 370, Disciplinary Docket no. 1 Disciplinary Board no. 15 D.B. 83, in which respondents were suspended for periods coincident with sentences of probation. The board is of the opinion that generally a person who is under sentence, whether by federal court or by state court, should not be permitted to practice before the courts of this Commonwealth, and the board recommends accordingly.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends to your honorable court that respondent be suspended from the practice of law for a period of three years retroactive to February 3, 1984, which is the date of respondent's original suspension. The Disciplinary Board further recommends that the costs be paid by respondent.

## AMENDATORY ORDER

NIX, *C.J.*, And now, this April 25, 1985, the first sentence of the second paragraph of the order entered by this court on April 23, 1985, is hereby amended to read: ordered that [Respondent] be and he is suspended from the Bar of the Commonwealth for a period of 30 months commencing February 3, 1984, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

## PARAGRAPHS 1-5 OF PETITION FOR DISCIPLINE

1. Petitioner, whose principal office is located at 300 North Second Street, Harrisburg, Pa. 17101, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

2. Respondent, [ ], is a formerly admitted attorney in the Commonwealth of Pennsylvania, who maintained a law office at [ ]. Respondent was born in 1944, and was admitted to practice law in the Commonwealth of Pennsylvania in 1969.

3. On February 3, 1984, the Supreme Court of Pennsylvania entered an order directing that respondent, pursuant to his criminal conviction, be immediately suspended from the practice of law, and that, in accordance with the provisions of Rule 214(c) of the Pennsylvania Rules of Disciplinary Enforcement, the matter be referred to the Disciplinary Board for the institution of formal proceedings to determine the extent of final discipline to be imposed. A true and correct copy of said order is attached hereto, and incorporated herein as Exhibit "A".

4. On December 16, 1983, an Information was filed against respondent in the United States District Court for the [ ] District of Pennsylvania at no. [ ] Criminal, a true copy of which Information is attached hereto and incorporated herein as Exhibit "B". Respondent was charged with ten counts of receiving illegal fees for legal services rendered to claimants for black lung benefits from the United States Department of Labor, in violation of Title 33, United States Code, §928 (e).

5. On December 16, 1983, respondent pled guilty to the ten counts of illegal receipt of fees for services rendered to black lung claimants. As evidenced by a judgment and probation/commitment order, a true and correct copy of which order is attached hereto, and incorporated herein, as Exhibit "C", respondent was sentenced on January 6, 1984, which sentence includes six months of imprisonment. Respondent's sentence is set forth in full in Exhibit "C".

## PETITIONER'S PROPOSED FINDINGS OF FACT

1. Respondent, [ ], is a formerly admitted attorney in the Commonwealth of Pennsylvania, who maintained a law office at [ ]. Respondent was

born in 1944, and was admitted to practice law in the Commonwealth of Pennsylvania in 1969 (answer to petition for discipline, Paragraph 2).

2. On December 16, 1983, an Information was filed against respondent in the United States District Court for the [ ] District of Pennsylvania at Criminal no. [ ]. Respondent was charged with ten counts of receiving illegal fees for legal services rendered to claimants for black lung benefits from the United States Department of Labor, in violation of Title 33, United States Code, §928(e).

3. On December 16, 1983, respondent pled guilty to the ten counts of illegal receipt of fees for services rendered to black lung claimants. Respondent was sentenced on January 6, 1984, which sentence included six months imprisonment.

4. On February 3, 1984, the Supreme Court of Pennsylvania entered an order directing that respondent, pursuant to his criminal conviction, be immediately suspended from the practice of law, and that in accordance with the provisions of Rule 214, Pa.R.D.E., the matter be referred to the Disciplinary Board for the institution of formal proceedings to determine the extent of final discipline to be imposed.

5. On March 2, 1984, United States District Judge [A] ordered that respondent's confinement would terminate on March 5, 1984, and that as a special condition of his two year probation period, respondent would reside and participate in the program of a residential community treatment center for a period of 60 days.

6. As a result of the investigation of respondent by the U.S. Department of Labor, initially 42 black lung claimants had been identified who paid unauthorized legal fees to respondent for a total sum of $68,240.

7. Out of the original 42 black lung claimants originally identified by the U.S. Department of Labor and who paid unauthorized legal fees to respondent, in 21 of those claims respondent had also filed fee petitions and collected an authorized fee from the Department of Labor (as well as collecting the unauthorized legal fee directly from the claimant).

8. After respondent pled guilty, the Department of Labor identified additional black lung claimants who had paid unauthorized and illegal fees to respondent, and, as of the time of the disciplinary hearing, a total of 65 black lung claimants had been identified who had paid an approximate total of $165,000 in illegal fees to respondent.

9. Out of the ten individuals included in the ten counts of the information, in four instances respondent had collected illegal fees from the client and had received as well the authorized fee from the Department of Labor.

10. As part of the ongoing investigation by the U.S. Department of Labor, various conversations were recorded between respondent and black lung claimants, with the knowledge of the claimants, but without the knowledge of respondent.

11. During the conversation between respondent and black lung claimant [B] on June 8, 1983, respondent made the following statements:

a. Respondent informed [B] that the government's investigation of him is "their way of stopping lawyers from representing black lung claims."

b. Respondent encouraged [B] to tell the investigators that the black lung fees paid by [B] to respondent were for other matters, noting, "That's right you did, but nobody knows what it's for . . . The only way they know you paid me $733 on the black lung is if you tell them."

c. Respondent told [B] that all lawyers charge illegal black lung legal fees and stated, "There are no lawyers who do not charge the 25 percent just so you know. Lawyers all charge 25 percent because the government tears them apart on their fee petitions."

12. During the conversation between respondent and [C] on June 15, 1983, respondent made the following statements (Exhibit P-11):

a. Although [C] had previously paid respondent an illegal black lung fee, respondent stated his approval (by the use of the word "good") when [C] told respondent that he, [C], had allegedly told the investigator that [C] had not paid respondent any legal fee.

b. Although respondent indicated that he could not tell [C] to say anything but the truth, respondent emphasized to [C] that if he did tell the truth, it would cause a "problem" for respondent.

c. Respondent told [C] that the Department of Labor investigators are "trying to stop the lawyers from representing people because if the lawyers represent them, then they get their money as you did."

d. Respondent concluded his conversation with [C] by telling [C] to tell the investigators that only the "government" paid respondent's legal fee.

13. During the conversation between respondent and [D] on June 14, 1983, respondent made the following statements:

a. When [D] told respondent that he, [D], had told the investigators that he didn't know if he had paid respondent any legal fee and that he would have to talk to respondent, respondent stated to [D], "You should have just told her you didn't pay anything" (despite the fact that [D] had indeed paid respondent over $4,000 in legal fees for black lung representation).

14. During the conversation between respondent and [E] on June 14, 1983, respondent made the following statements:

a. Although [E] was aware that her deceased husband had paid respondent $2,800 in black lung legal fees, respondent told her to tell the investigators, "Well, the answer is you don't know what he did during his lifetime, do you?

b. Although respondent told [E] that he could not tell her to lie, he emphasized, "If you tell them that, it's going to get me in trouble, obviously. Because they want me to petition for fees, and I don't petition for fees. I have no records, so I can't tell them anything."

c. Respondent told [E], "They're after all lawyers as a matter of fact . . . See this is something that all lawyers do, but the problem is that I have more cases than anyone else."

15. Although black lung claimant [F] had paid respondent 25 percent of his first black lung compensation check, which legal fee amounted to $4,343, respondent told [F] "several times" to respond to the letter of inquiry from the U.S. Department of Labor by stating that [F] had not paid respondent any black lung fees.

16. Even after respondent had pled guilty, he continued to try to justify his criminal misconduct by claiming, "It's the common thing. Everybody does it".

17. All restitution paid by respondent to black lung claimants was paid only after the initiation of the investigation by the U.S. Department of Labor and was made pursuant to the plea bargain between respondent and the U.S. Attorney's Office.

## RESPONDENT'S PROPOSED FINDINGS OF FACT.

1. [Respondent] ([respondent] hereafter), age 39, was an active member of the Pennsylvania Bar from October of 1969 until his suspension from the practice of law on February 3, 1984.

2. [Respondent] graduated from the [ ] University School of Law in 1969.

3. The law firm with which [respondent] practiced has been active in Pennsylvania since 1936.

4. Upon graduating from law school, [respondent] practiced law with his father, [G], and in 1971 they became partners, practicing together until [respondent's] suspension on February 3, 1984.

5. The nature of the practice of the [G & Respondent] law firm was principally administrative, i.e., Social Security and workers' compensation (including both state and Federal Black Lung claims), with a great deal of domestic relations and personal injury representation as well. The workers' compensation practice was segregrated into a separate law firm in which [G] was not a member because he was — and is — a workers' compensation referee.

6. Federal Black Lung work comprised about ten percent of the case load of the [Respondent] firm.

7. The Federal Coal Mine Health & Safety Act (Black Lung Law) was enacted by Congress in the same year as [respondent] was admitted to the bar and he began handling black lung cases in 1969.

8. In representing coal miners (and their dependents) who have claims for black lung (anthracosilicosis) claims, and in order to maximize their benefits, [respondent] proceeded, when appropriate, concurrently to prosecute both Pennsylvania Occupational Disease and Federal Black Lung claims as well as Federal Social Security Disability claims.

9. In 1969, federal black lung cases were administered by the Department of Health, Education & Welfare (now Health & Human Services).

10. In 1969, Social Security disability cases were likewise administered by the Department of Health, Education & Welfare.

11. From 1969 until 1979, lawyer's fees before the Department of Health, Education & Welfare, in both Federal Black Lung and Social Security Disability cases, were adjudicated by (generally law-trained) Administrative Law Judges who had presided over the cases and who almost universally allowed a fee measured by 25 percent of the initial payment of past due benefits.

12. In Pennsylvania Workers' Compensation cases, counsel, in most successful cases at all times pertinent hereto, have received a fee measured by 20 percent of the entire award (i.e., initial payment as well as all future payments) as approved by the presiding referee.

13. As part of the recovery before the Department of Health, Education & Welfare counsel was entitled to reimbursement of costs.

14. In consonance with the policy of the Department of Health, Education & Welfare whereby 25 percent of the initial Black Lung award was withheld for counsel fees, [respondent] entered into contingent fee agreements with claimants in both Federal Black Lung cases and Social Security Disability cases for payment of a fee measured by the amount of 25 percent of the first check only.

15. In 1979 the administration of Federal Black Lung cases was transferred to the Department of Labor from the Department of Health & Human Services.

16. Upon successfully representing claimants in Federal Black Lung cases transferred to the Depart-

ment of Labor, [respondent] submitted fee petitions to the Department of Labor detailing 40 to 60 hours of work on each of the various claims, enclosing a copy of the contingent fee agreement executed by his clients, and requesting a fee of $3,000 to $4,000; but, contrary to the prior practice before HEW, the petition reviewers authorized fees ranging from only $50 to $100 for the legal work performed on behalf of the successful claimant.

17. These fee petitions before the Department of Labor were passed upon not by Administrative Law Judges (as Federal Black Lung claims had been in the Department of Health, Education & Welfare) but, rather, were reviewed by laymen who were not law-trained and who had no experience with the handling of black lung claims.

18. Pursuant to his contingent fee agreements with his clients, and notwithstanding the failure of the Labor Department reviewers to authorize the fees, [respondent] continued to collect 25 percent of the first check in some Federal Black Lung cases after the system changed in 1979 and the 25 percent fees ceased to be almost automatically approved.

19. At the hearing before this committee, [respondent] related that he continued to collect the 25 percent fee because his law firm had invested years of time and effort into the black lung cases (in many instances prior to the change in 1979) which claims had been repeatedly denied at the administrative level on multiple occasions (but were ultimately allowed on appeal) and because the fees allowed by the lay reviewers failed to pay even for the actual lawyer time and effort invested.

20. [Respondent] related the complexity involved in handling Federal Black Lung claims and stated that his firm, including four associates and a law

clerk, expended much time in the black lung cases dealing with doctors, reviewing highly technical medical and pulmonary studies, examining witnesses, presenting testimony and submitting written presentations, and studying the changing regulations and law.

21. [Respondent] related that it was not economically feasible to handle Federal Black Lung cases on the basis of the fees allowed by the Labor Department because the lay claims examiners simply would not adequately compensate [respondent] (or any attorney).

22. If an attorney loses a Federal Black Lung case there is, of course, no way for him to receive any money for his representation or even for reimbursement of his costs.

23. In those cases where [respondent] collected a fee from the government as well as from the claimant, the government authorized fee was usually deducted from the claimant's payment; i.e., the claimant ordinarily did not pay more 25 percent of the initial award.

24. [Respondent] has made restitution to his former clients of all unauthorized fees which he has collected and of which he has knowledge; in fact, [respondent] "repaid" fees to clients even if there was a doubt as to whether the fee was an unauthorized fee.

25. At all times since [respondent] began to practice law — continuing to the present — lawyers who successfully handle Social Security Disability cases have been permitted to charge contingent fees and to charge contingent fees in workers' compensation cases.

26. Initially, [respondent] was not aware that receipt of contingent fees for Federal Black Lung cases was unlawful.

27. The violations here in issue occurred between January 1979 and February 1984.

28. [Respondent] was unaware that it was unlawful to recoup costs in a black lung case until he learned that these payments were listed as violations of the federal law by a federal investigator.

29. On December 16, 1983, [respondent] pled guilty to ten counts of an Information charging collecting of Federal Black Lung fees without prior government approval (33 U.S.C.A. §928 (e)) before Judge [A] of the United States District Court for the [ ] District of Pennsylvania.

30. The initial sentence of the court was six months in prison with two years probation and a fine of $10,000.

31. The fine was paid and the sentence modified on March 5, 1984 such that [respondent] received a release on that date from [ ] Federal Prison to a work release center in [ ]; at the end of March, the sentence was further reduced such that the work release requirement was omitted.

32. [Respondent] was unable to attend the first meeting of this hearing committee because he was hospitalized under the care of [H] M.D., a psychiatrist, which hospitalization resulted, in part at least, from a domestic crisis in which his wife, two days before his disciplinary hearing, removed herself and their three children from the marital home to whereabouts unknown; [respondent's] diagnosis at the time of his hospitalization was major depression.

33. [Respondent's] 14 month old daughter died on April 24, 1982.

34. [Respondent's] wife suffers from an emotional disorder including paranoia which has become particularly severe since the death of the child and [respondent's] criminal and disciplinary prosecution.

35. In the course of the hearing before this hearing committee, [respondent] himself demonstrated the grief from which he suffers due to the death of his child and the matters which bring him before this committee.

36. [Respondent's] father is 77 years old and is still active as a workers' compensation referee.

37. Prior to his suspension, [respondent] worked ten to fourteen hours a day, seven days a week, and was responsible for the work performance of all the law firm attorneys.

38. [Respondent's] suspension from the practice of law has devastated his entire life, removing the core of his existence.

39. Transcripts of conversations with black lung clients were introduced and played at the proceedings before this hearing committee; these conversations took place in the course of the Federal Investigation. [Respondent's] explanation for his tape recorded conduct was that he was in panic and that he was under enormous stress. (He had not resolved the loss of his child; he had the burden of the law practice; and he had the burden of a wife who is psychotic.) Listening to [respondent's] speech and statements on the tape corroborates his testimony of the effect that he panicked.

40. [Respondent] continues to be under the care of Dr. [H].

41. The committee finds that [respondent] is remorseful about what he has done and notes that he has — both before this committee and before Judge [A] — fully and voluntarily recognized and admitted the error of his having charged and received unauthorized fees.

42. As part of [respondent's] criminal case, government attorneys came forward and admitted that the Labor Department had been unfair in dealing

with lawyers and their fees.

43. Even when the lay examiners authorized fees to [respondent], in many cases the Labor Department has still not paid the fees, to the extent that the Government has owed [respondent] about $100,000 in fees which it had authorized but not paid.

## ADDITIONAL FINDINGS OF FACT FROM HEARING COMMITTEE REPORT.

1. Sometime prior to the federal prosecution of respondent, the Department of Labor undertook a study in the area of the Middle Atlantic States concerning attorney violations of 33 U.S.C. §928(e) after which it was determined that there were numerous violations of said section by significant numbers of attorneys.

2. The Department of Labor decided at that time to press a criminal prosecution of respondent [ ], and to that end focused most if not all of their efforts.

3. Black lung clients of respondent were corresponded with, interviewed and engaged by the department to surreptitiously gather further evidence for their prosecution.

4. Becoming aware of the department's efforts, respondent became frustrated and angry, having observed a significant aspect of his practice in which he had a special expertise, undergo such substantial change as a result of administrative and regulatory modifications, so as to make continued practice in that area economically unfeasible.

5. During the period of his prosecution both criminally by the Department of Labor, and professionally by the Disciplinary Board, respondent, [ ] experienced severe personal crisises involv-

ing the death of his daughter, marital instability and personal emotional instability.

6. In spite of personal difficulties respondent encountered during the period above referred to, his unprofessional conduct remains unjustifiable and he should be appropriately disciplined.

7. At best, the personal turmoil experienced by respondent during this time period mitigates his culpability to a degree. There is no doubt that respondent was not behaving normally.

8. Respondent's remorse was evident throughout the hearing.